*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A25-0748

Richard L. Greenstreet,
Appellant,

vs.

Central Minnesota Educational Research & Development Council,
Respondent,

Lowell Haagenson,
Respondent.

**Filed March 2, 2026**
**Affirmed**
**Smith, Tracy M., Judge**

Benton County District Court
File No. 05-CV-24-1244

Richard L. Greenstreet, Sauk Rapids, Minnesota (self-represented appellant)

Central Minnesota Educational Research & Development Council, Sauk Rapids, Minnesota (respondent)

Lowell Haagenson, Sauk Rapids, Minnesota (self-represented respondent)

Considered and decided by Harris, Presiding Judge; Smith, Tracy M., Judge; and

Florey, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**SMITH, TRACY M.**, Judge

Following a court trial and the district court's dismissal of appellant's claims related to his gardening activity on respondents' property, appellant argues that the district court erred by disregarding his investment in improvements, which appellant contends converted his revocable license to garden on the property into an easement. We affirm.

**FACTS**

The following factual summary is drawn from the district court's findings of fact, conclusions of law, and order.

Appellant Richard L. Greenstreet lives in a senior housing complex next door to a property owned by respondent Central Minnesota Educational Research and Development Council (CMERDC). Respondent Lowell Haagenson is the executive director of CMERDC. CMERDC bought the property in 2022.

The property was previously owned by the Benton County Historical Society. Sometime around 2012, based upon an informal agreement with the Historical Society, Greenstreet began maintaining a community garden on the property. Greenstreet and other community members invested significant labor in the garden, producing a variety of crops, including strawberries, tulips, rutabagas, eggplants, and many other vegetables. This arrangement continued for 11 years, until the Historical Society sold the property to CMERDC.

Sometime in 2023, Haagenson met Greenstreet while Greenstreet was gardening on the property. Haagenson agreed to allow Greenstreet to continue gardening on the property

through the 2023 growing season. But he explained to Greenstreet many times that he had reservations about continued gardening there in the 2024 season because of underground fixtures and construction activity occurring then. Haagenson also spoke with the apartment manager at the senior housing complex, sharing with her his concerns about the garden's location, safety, and liability, given the construction taking place on the property. Haagenson learned that the senior housing complex had offered Greenstreet the ability to garden on its property but Greenstreet declined.

On April 15, 2024, Greenstreet and Haagenson met with a CMERDC employee to discuss continued use of the garden plot. Greenstreet recalls that the parties orally agreed that he could continue to use the garden for the 2024 growing season, but Haagenson recalls this meeting as one where he reiterated his concerns about continued gardening there. On May 2, 2024, Greenstreet signed a release form prepared by the CMERDC employee, stating: "Richard Greenstreet . . . do[es] attest that I am waiving any liability of injury or damages to my person due to items on [CMERDC] property." Greenstreet testified that he understood the document to mean that he had permission to plant and maintain the garden for the summer, but Haagenson testified that he had Greenstreet sign the waiver after discovering him on the property while construction activities were taking place.

Later in the day on May 2, Haagenson emailed the apartment manager regarding CMERDC's concerns about their tenant, Greenstreet, gardening on the property. Haagenson reiterated his concerns that the planned excavation work would render the area "unsuitable for gardening." He also wrote:

> [CMERDC employee] and I had told a tenant in your building it was okay to garden in that area this year after excavation is completed and it is determined safe to garden there.
>
> [We] have been clear that no tilling nor digging is to be done until after excavation—likely mid-to-late May.

At trial, Greenstreet acknowledged that he knew about the meeting and Haagenson's communication that Greenstreet could not garden until excavation was completed.

During the summer, Haagenson removed the perimeter posts from the garden and offered to move the topsoil, tulip bulbs, and strawberries to an alternative garden space that the apartment manager had offered to Greenstreet. This offer was not acknowledged or accepted by Greenstreet, so, after a series of construction delays, Haagenson authorized demolition of the garden on July 8, 2024. As a result, the site became unsuitable for gardening.

Greenstreet sued respondents, asserting claims for damages and other relief based on promissory estoppel and an equitable or implied easement. He also sought punitive damages and other relief. The district court ruled in favor of respondents, dismissing Greenstreet's claims with prejudice. This appeal follows.[1]

---

[1] All parties were self-represented in the district court and on appeal. No response brief was filed by either respondent. Therefore, this case will be decided on the merits as provided in Minn. R. Civ. App. P. 142.03.

**DECISION**

On appeal, Greenstreet challenges only the district court's dismissal of his equitable easement claim, so we limit our review to that claim.[2] Following a court trial, a district court's findings of fact will not be set aside unless they are clearly erroneous. *Roberts v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999). But the district court's conclusions of law are reviewed de novo. *W. Insulation Servs., Inc. v. Cent. Nat'l Ins. Co.*, 460 N.W.2d 355, 357 (Minn. App. 1990).

Greenstreet argues that he was given a license by the prior owner—the Historical Society—to use the property for gardening and that the license was converted into an easement by virtue of the money he spent gardening and the long duration of his use.

"[A] license is not an estate but a permission giving the licensee a personal legal privilege enjoyable on the land of another." *Minn. Valley Gun Club v. Northline Corp.*, 290 N.W. 222, 224 (Minn. 1940). Licenses are revocable (1) at the will of the licensor or (2) due to the transfer of landownership unless the new property owner chooses to continue allowing the use. *See Chi. & N.W. Transp. Co. v. City of Winthrop*, 257 N.W.2d 302, 304 (Minn. 1977). "Because a license is generally revocable, it is not an encumbrance upon land." *Id.*

An easement, on the other hand, is "an interest in land in the possession of another which entitles the owner of such interest to a limited use or enjoyment of the land in which

---

[2] In his brief, Greenstreet appears to concede that his claims all depend on the existence of an equitable easement, and he does not separately challenge the district court's denial of his other claims for relief.

the interest exists." *Minneapolis Athletic Club v. Cohler*, 177 N.W.2d 786, 789 (Minn. 1970). Equitable easements are easements in which "the equitable powers of the court are called into play." *Highway 7 Embers, Inc. v. Nw. Nat'l Bank*, 256 N.W.2d 271, 277 (Minn. 1977). In the context of easements, courts most often invoke their equitable powers when there is a dispute regarding ownership or use of a portion of land or if there is a preexisting easement with a vague description. *Id.* The courts are not free to create an easement when the agreement between the parties does not permit such flexibility. *Willenberg v. Frye*, 3 N.W.3d 23, 28 (Minn. App. 2024).

After hearing the trial testimony and reviewing the exhibits, the district court rejected Greenstreet's equitable-easement claim. It observed that Greenstreet did not claim the existence of a vague or preexisting easement that might warrant an equitable easement. Instead, the district court determined, Greenstreet was granted two licenses to garden on the property. First, the Historical Society granted Greenstreet a license to garden on the property while it owned the property but that license "was effectively revoked" when CMERDC purchased the property. Second, following CMERDC's purchase of the property, respondents gave Greenstreet a license to garden for just one season in 2023. The district court determined that, "without a formal agreement explicitly stating otherwise," what happened with the garden after CMERDC purchased it was at the discretion of CMERDC.

We see no error in the district court's factual findings or legal conclusions. The executive director of the Historical Society, whose testimony the district court found credible, testified that Greenstreet had an informal agreement with the Historical Society

that he could use a portion of their land to plant a garden. She also testified that she told Greenstreet that permission to continue to use the land would have to be obtained from the new owner. Haagenson, whose testimony the district court also found credible, testified that he allowed Greenstreet to garden for one season but then informed Greenstreet that he would need to wait to continue gardening until after construction was complete and that permission to garden would be contingent upon determining that it was still safe to garden in the area. These witnesses' testimonies support the district court's findings regarding the limited permission given to Greenstreet to use the property. And the findings support the district court's conclusion that Greenstreet had a revocable license to use the property and was not entitled to an equitable easement.

Greenstreet contends, however, that his license was converted into an equitable easement by his expenditures on the garden. But that argument misunderstands the law. "A licensee is conclusively presumed, as a matter of law, to know that a license is revocable at the licensor's pleasure; and if the licensee expends money in connection with his entry upon the licensor's land, he does so at his own peril." *Larson v. Amundson*, 414 N.W.2d 413, 418 (Minn. App. 1987) (citing *Minneapolis Mill Co. v. Minneapolis & St. Louis Ry. Co.*, 53 N.W. 639, 641 (Minn. 1892)). In *Larson*, we refused to conclude that an oral agreement creating a license was irrevocable even when the licensee had contributed over $2,000 to pave the driveway and maintain it and had continued to use if for ten more years after making those contributions. *Id.* at 418-19.

Greenstreet supports his argument by citing *City of Hutchinson v. Wegner*, 195 N.W. 535 (Minn. 1923), which he claims demonstrates that his revocable license was

7

converted into an easement due to his "costly improvements" in the garden. But this case supports the opposite conclusion. In *Hutchinson*, the city made an agreement with a landowner that, if the landowner allowed the city to connect its waterworks to the landowner's well for its water supply, the city would provide water for use at the landowner's flour mill. 195 N.W. at 536. In reliance on the agreement, the city spent $20,000 to connect its waterworks to the well and build a pumping station opposite the mill. *Id.* Eighteen years later, a subsequent landowner began charging the city for the water that it was taking and gave notice that he would shut off the water if the city did not pay. *Id.* The city sought an injunction restraining him from shutting off the water, arguing that it had a perpetual right to use the well—in other words, an easement—and the district court agreed. *Id.* The supreme court, however, determined that the evidence showed only that the landowner gave the city "permission to use the well without specifying how long the privilege should continue" and that all the city had was a revocable license. *Id.* Importantly, the supreme court determined that the city's $20,000 expenditure did not support the establishment of an easement because the city had "saved money by not sinking a well on its own land." *Id.* at 537.

Here, the Historical Society gave Greenstreet permission to use the property and did not require any type of consideration in return. It is true that Greenstreet spent money to plant the garden and invested his time to nourish it. But his expenditure did not support the establishment of an easement because Greenstreet would have spent the same amount to plant the garden elsewhere. Furthermore, as a licensee, he was presumed to know that the license was revocable and was even told as much by the Historical Society. Greenstreet's

8

expenditure of money in connection with his use of respondents' land was done "at his own peril" and did not create an equitable easement. *Larson*, 414 N.W.2d at 419; *see also Minneapolis Mill*, 53 N.W. at 641.

**Affirmed**.